Quisenberry's devisees *vs.* Quisenberry's heirs.     CHANCERY.

ERROR TO JESSAMINE CIRCUIT.     Case 21.

1. Upon the trial of a will case before a jury, which was contested upon two grounds—1. The incompetency of the testator. 2. Improper influence and fraud—the jury rendered a verdict in these words: "We of the jury believe, from the testimony, that owing to the organization of the mind of Joel Quisenberry, and his suffering, pain, and disease, he was not, on the 25th August, 1847, capacitated to make a valid will and testament, and for these reasons we find the paper, set up and relied on in the pleadings in this case, is not his true last will and testament." Held, that this verdict is in substance and effect a finding that the testator had not sufficient capacity to make a will.

2. The power of a jury to determine facts upon the evidence, is not a power of the will merely, but involves the exercise of judgment and discretion, and is subjected to those restraints which judgment and discretion imply; and there are cases in which the court of appeals, against the opinion of the circuit judge, will grant new trials in will cases. The difficulty is lessened where the verdict itself involves an error of law, or is induced by an erroneous instruction of the court.

3. Where the proof in a will case showed that the testator frequently declared his intention to give his land to his sons, and his other property to his daughters, and also declared his intention to make an equal distribution of his estate, and the will was assailed for incapacity in the testator, and undue influence and fraud, it was error in the court, and misleading to the jury, to instruct them that the evidence of the testator's declarations of an intention to make an equal will was a circumstance entitled to their consideration on the question of competency and undue influence, without qualification.

4. It is misleading for the court to give an instruction based upon the evidence upon one side, thereby authorizing a controlling effect to be given to a single fact, without regard to other countervailing facts which the jury is bound to consider. A will is not to be regarded as invalid because not made in conformity to a previous declaration of the intention of the testator.

Judge MARSHALL delivered the opinion of the court.     June 26.

On the 25th day of August, 1847, Joel Quisenberry, then laboring under an acute disease of the bladder and urethra, requiring frequent use of the catheter to draw off his urine, executed an instrument purporting to be his will, and as such attested by two subscribing witnesses. On the 4th of September following he died of the disease above referred to, and on the 30th of the last named month, this bill was

filed by his daughters and sons-in-law, and the children of a deceased daughter, impeaching the validity of said instrument as a will, on the ground—1st. That, at the time of its execution, the decedent was not competent in mind and memory to make a will; and 2d. That, by the improper influence and fraud of his sons, or some of them, he had, though intending to make an equal distribution of his property among his children and their representatives, been induced to make a grossly unequal distribution, whereby his sons would receive greatly more than his daughters. The sons and widow of the deceased were made defendants. The answers contested the main allegations of the bill, and the will having been admitted to probate in the county court of Clarke county, and the issue prescribed by the statute having been made up in the chancery suit, the proper grounds of proceeding in that suit, which had been wanting when the bill was filed, were thus supplied. After a litigation of some six years, in which an immense record of more than four hundred pages has been unnecessarily made up, and after four hung juries, a verdict was at length obtained against the validity of the will, and the motion for a new trial having been overruled, the defendants have brought the case to this court for revision and reversal.

The verdict rendered is not simply a response either to the general issue of will or not, as made under the statute, or to the particular grounds of impeachment alleged in the bill. It runs in the following words: "We of the jury believe, from the testimony, that owing to the organization of the mind of Joel Quisenberry, and his suffering, pain, and diseases, he was not, on the 25th day of August, 1847, capacitated to make a valid will and testament, and for these reasons we find the paper set up, and relied on in the pleadings in this cause, is not his true last will and testament." It is contended that this is, in effect, a general verdict against the validity of the will, and that it may be sustained by any evi-

1. Upon the trial of a will case before a jury, which was contested upon two grounds—1. The incompetency of the testator. 2. Improper influence and fraud—the jury rendered a verdict in these words: "We of the jury believe, from the testimony, that owing to the organzation of the mind of

dence found in the record which would, under the pleadings and issue, authorize the jury to find such a verdict. But the jury having expressly restricted their finding against the will to the single ground or reason that Joel Quisenberry was not capacitated, at its date, to make a valid will, it is impossible to say that they have found any other fact as the ground of this conclusion, save the want of capacity alone, and if any other fact be assumed in support of this conclusion, it is to be assumed not on the authority of the verdict, but upon the evidence alone. To authorize such an assumption by the court, it is not sufficient that the jury might, upon the evidence, have found an additional fact to sustain their general conclusion; but if such fact, not included in the verdict, can be assumed to sustain it, this can only be done upon such evidence as establishes it conclusively, and would make it the clear duty of the jury to find it. It is immaterial, therefore, to inquire whether, upon the evidence in this record, the jury might or might not have been justified in finding that Joel Quisenberry was induced to execute the paper, now set up as his will, by the improper influence or fraud of his sons, or any of them. There is certainly no proof which would compel a jury to find, and none which would authorize this court to assume, as a ground for sustaining the verdict against the will, that its execution was procured by any fraudulent or undue means on the part of Joel Quisenberry's sons, or any of them. The motion for a new trial does not bring up the question whether the jury might have found that any such means had been resorted to. It is sufficient to say, that their failure to find such fact is fully justified by the evidence in the record, and for that reason we abstain from any intimation of opinion as to the effect of the evidence upon this point.

The substance of the verdict is, that at the date of the paper now in question, Joel Quisenberry was not competent to make a valid will; and, although the verdict accounts for this incompetency, partly by ref-

QUISENBERRY'S
DEVISEES
vs.
QUISENBERRY'S
HEIRS.

Joel Quisenberry, and his suffering, pain, and disease, he was not, on the 25th August, 1847, capacitated to make a valid will and testament, and for these reasons we find the paper, set up and relied on in the pleadings in the case, is not his true last will and testament." Held, that this verdict is in substance and effect a finding that the testator had not sufficient capacity to make a will.

erence to the organization of his mind, and partly by reference to suffering, pain, and disease, we suppose the real question involved is, whether he was in mind and memory competent to make a will, and that it is immaterial whether the testimony illustrative of this general question assigns any particular effect to his mental organization or to other causes. Indeed, we should be at a loss to say what particular mental organization, or that any particular mental organization, not amounting in itself to insanity or incompetency of mind, would incapacitate a person from making a will; and we can but remark, that there is in the very face and front of the verdict, a palpable, and it would seem a conscious weakness in presenting its decision of the case in the form of an inference, founded on vague generalities, instead of making the plain and direct assertion that, at the time of executing the paper relied on as a will, Joel Quisenberry had not sufficient mental capacity to make a valid will. This, however, must be regarded as the legal effect of the verdict, and we shall so regard it in considering the question whether it should have been set aside, or should now be set aside, as contrary to law and evidence.

We are aware of the great weight which has always been given by this court to the concurring opinions of the jury and the circuit judge, upon the question of the verdict being or not being contrary to the evidence. But the power of the jury in determining facts upon the evidence is not a power of the will merely, but it is a power involving the exercise of judgment and discretion, and it must be in a reasonable degree subject to those restraints which judgment and discretion imply. And although the circuit judge who tries the cause, and sees and hears the witnesses, has in general great advantages over this court in determining whether any particular case is a proper one for applying the correcting power of the judge to the verdict of the jury, still there are cases involving fact and evidence alone, in which this court will grant a new trial in opposition to the opinion of

2. The power of a jury to determine facts upon the evidence, is not a power of the will merely, but involves the exercise of judgment and discretion, and is subjected to those restraints which judgment and discretion imply; and there are cases in which the court of appeals, against the opinion of the circuit judge, will grant new trials in will cases. The

the circuit judge; and the difficulty vanishes whenever a verdict, deemed erroneous, involves in any degree an error of law, or may be attributed to an erroneous instruction from the court.  In this case it is contended that the verdict is contrary to the evidence or to the law upon the evidence, and also that it is infected by an instruction which, if not technically erroneous, was at least misleading as the case stood before the jury, and that on one or both of these grounds a new trial should be granted.

In considering these objections to the verdict, and to the decree sustaining it, we shall not deem it necessary to enter into any minute detail of facts or evidence.   There is in fact but little, if any, contrariety or contradiction of testimony, and a general statement of the character and effect of the evidence will suffice to indicate the legitimate deductions which it authorizes, and also to show the bearing and probable effect upon the finding of the jury, of the instruction objected to.

It appears that Joel Quisenberry, before attaining any extraordinary length of years, had accumulated a considerable estate.   He had increased the quantity of his land from about one hundred acres to about one thousand and ninety acres, all in the county of Clarke, and lying pretty much in one body, though purchased at different times, and in various parcels.   He had also acquired slaves and personal property of large value, from which he had made partial advancements to most of his children.   He had raised five children of each sex, one son being dead before him, without issue, and also one daughter, who left two children living at his death.   The substance of the will as first written is, that the land is given to the four sons, and the slaves and other property to the four living daughters and the children of the deceased daughter; and much proof is taken to show that the land is greatly more valuable than the other property, and that consequently the share given to each of the sons greatly exceeds that given to

---

QUISENBERRY'S
DEVISEES
*vs.*
QUISENBERRY'S
HEIRS.

difficulty is lessened where the verdict itself involves an error of law, or is induced by an erroneous instruction of the court.

each of the daughters; and to give this inequality a bearing upon the question of the validity of the will, it is also proved by many witnesses that Joel Quisenberry had said repeatedly, and on numerous occasions, that he intended to distribute his estate equally among all his children; had used arguments in favor of equality; and had, on some occasions, said if there were any difference between sons and daughters it ought to be in favor of daughters. And the inference drawn in argument, from a comparison of the actual will with these declarations of intended equality, is that the actual will is to be accounted for by supposing either a want of capacity to carry out the intention or the use of some improper means by those interested in producing a departure from the intended rule of distribution.

3. Where the proof in a will case showed that the testator frequently declared his intention to give his land to his sons, and his other property to his daughters, and also declared his intention to make an equal distribution of his estate, and the will was assailed for incapacity in the testator, and undue influence and fraud, it was error in the court, and misleading to the jury, to instruct them that the evidence of the testator's declarations of an intention to make an equal will was a circumstance entitled to their consid-

But it is established by proof equally satisfactory and conclusive as that which establishes these declarations of intended equality, that the decedent had for many years before his death, on numerous occasions, and on many, perhaps most of those in which he had expressed the intention to make an equal distribution among his children, also said that he intended to give his land to his boys, and his other property to his girls, stating, on some of these occasions, as a reason for this distribution, that the boys had by their labor helped or enabled him to buy the land, which he had done at a low price, and that they ought to have the advantage of the increase in its value; while at other times, in addition to the statement that he intended his land for his boys, and his other property for his daughters, he also indicated that he intended or expected to make an equal division between them. It turns out, however, that according to the estimates of most of those who speak on the subject, the slaves and personalty of the decedent were not, at the time of his death, sufficient to make the portions of the daughters nearly equal to those which the sons would have in the land, and it does not appear that the case would have been different at any time during the se-

ries of years which elapsed, while he was expressing these intentions.

It thus appears, that for a series of years before his death, and while his competency to dispose, by will, of the estate which his successful application of the labor at his command, and his skillful management and disposal of its products, had enabled him to acquire, could not be seriously questioned.

eration on the question of competency and undue influence, without qualification.

Joel Quisenberry entertained, or at least repeatedly expressed two principle ideas or intentions with respect to such disposition, both of which could not at any time have been fully and precisely carried out, and one or both of which must therefore, to a greater or less extent, have been abandoned or modified in any complete disposition which he might have made of his estate. It is only by assuming that one of these ideas or intentions was in the mind of the decedent, the sole and imperative rule of distribution to the exclusion of the other, and of all other principles by which it might be modified, that the departure from one of them can be regarded as a more certain indication of incapacity or undue influence, than a departure from the other would be. And even if it be conceded that the jury, if the question had been fairly presented, might have said that the decedent had no other intention but that of making an equal disposition of his estate, according to actual, value among all of his children, and therefore might have regarded a palpable departure from such equality, though produced by following out the other intention expressed of giving the land to the boys, as evidence either of incapacity or of undue influence. We are satisfied that the court had no right thus to sink the evidence conducing to prove an intention to give the land to the boys, and thus to disregard, in a greater or less degree, the principle of equality.

The instruction, that the evidence of Joel Quisenberry's declarations of an intention to make an equal will, is a circumstance entitled to consideration upon the question of competency and undue influence—

does, in effect make the proof of these declarations to furnish a rule or test of the decedent's intention with respect to his will, and it makes the departure of the alleged will from this rule or test evidence, of want of capacity or of undue influence, that is, it authorizes the jury to consider it as evidence of one or both of these facts, and thus to base a finding against the will as having been made either without sufficient capacity or under undue influence, altogether or mainly upon the fact that it is inconsistent with these declarations of intended equality.

We are not prepared to say that even an essential difference between a will as made, and the proof of what the testator had said it should be, is of itself to be taken as evidence either of incapacity or of undue influence. A man may be under no obligation to disclose the intended disposition of his estate; he may say one thing and do another, without affecting the validity of his will, and it is always a question whether his statements as to intention are sincere and reliable. But waiving this view, the objection to the instruction now in question, is that it takes up but one side of the case, and authorizes a controlling effect to be given to a single fact or piece of evidence, without regard to other countervailing facts or evidence, which the jury was bound to consider. If the instruction be understood as requiring something more than the representations of intended equality in order to invalidate the will, it does not define the nature or extent of the addition thus required, but leaving it to the jury to determine, this is practically an authority to find against the will, on the ground of incompetency or undue influence, if the decedent represented that he would make an equal will, and if the paper executed as a will was unequal, and they were authorized to do this, although the decedent may have also said that he intended to give his land to his sons and his other property to his daughters, and although this may have been his actual intention.

4. It is misleading for the court to give an instruction based upon the evidence upon one side, thereby authorizing a controlling effect to be given to a single fact, without regard to other countervailing facts which the jury is bound to consider. A will is not to be regarded as invalid because not made in conformity to a previous declaration of the intention of the testator.

This instruction is, in our opinion, misleading and erroneous, and the verdict found under its influence cannot be sustained, unless upon all the evidence in the case the jury were bound to find as they have done. But in looking to the other evidence bearing upon the question of competency, we are satisfied not only that there is no conclusive evidence of incompetency, but that upon the precise question whether, at the time of executing the alleged will, Joel Quisenberry was competent in mind and memory to make a valid will, the direct evidence is all upon the side of his competency, and there is nothing but vague conjecture and uncertain inference on which to found an opposite conclusion.

1. In the first place, of eight witnesses who were present while the will was being written, or when it was finally executed, including the two subscribing witnesses, every one concurs in the opinion that he was then of sound mind, and competent to make a will; and not only does no single witness who saw him during that period express a different opinion, but although there were then present, besides the witnesses who have testified, some three or four of his relatives, (daughters and sons-in-law,) interested in opposition to the will as then made, and although all the persons present were near relatives or neighbors and friends of the patient, including his wife, brothers, &c., of whom a part only had any peculiar interest in the disposition of his estate, and of whom all had been long and well acquainted with him, and most of them had been familiar with him during his illness, not one among them during the entire transaction suggested or in any manner intimated the idea that Joel Quisenberry was not then competent to make a will. And this negative testimony, strong in its general character, acquires additional weight from the consideration that one of the sons-in-law thus failing to suggest a doubt as to the mental capacity of the invalid, remained in the room during a considerable portion of the time

while the will was being written, and assuming to act as the representative of the daughters, actually objected, on the ground of inequality, to the general disposition made by the will, and interposed some obstacle to its execution.

2. In the second place, the will as made corresponds in its essential features with what the maker had often said it should be, although it does not make a precisely equal distribution among his children. He had said for years, and so often and under such circumstances as to leave no doubt as to his real purpose, that he would leave to his youngest son, T. J. Quisenberry, his home place and three or four hundred acres of land, with the charge of his mother during her life. This was actually done by his will, and being more than an equal portion given to one child, in itself contradicted and displaced the idea of precise equality, if it ever existed. The will also recites that Roger, another of the sons, had received more than his equal portion, and this fact is not controverted, so that the equality which is assumed as the test of capacity, and the governing principle of the case, had been rendered impracticable by the acts of the testator before the date of the will.

3. As the will was first written it gave all of the testator's land to his sons, but being read over in that shape in presence of such of the family as were in the house, the son-in-law above referred to objected that the daughters would not get equal shares, and it being suggested by some one present that the testator had said that some of his land should be sold for the benefit of his daughters, after some conversation with respect to the land to be thus sold, he caused to be inserted at the close of the will a direction, that should it turn out that the shares of his daughters were unequal, &c., a particular portion of his land, the same which he had formerly designated for that purpose in a conversation proved in the cause, should be sold for their benefit. He had said that no other part of his land should be sold for the purpose. With the excep-

tion of that part which was in fact the least valuable, he had said he did not want his land to be sold, and this he had given as one reasou why he would devise it to his sons, who would live on it, and not to his daughters, whose husbands were rich, had land elsewhere, and might be expected to sell his lands.

4. Thus the will, as originally written, conformed to the design often expressed of giving the land to the sons, and the other property to the daughters; and as altered it still conformed in the main to this design, departing from it so far as the testator had previously said he was willing his land should be sold for the benefit of his daughters. And although, according to the weight of opinions contained in this record, the distribution even with the additional clause is greatly unequal, to the disadvantage of the daughters, it not only does not appear that the testator was singular in the opinion, that his slaves and personalty would in fact make his daughters equal to his sons having his land, and especially if, as he may have intended or supposed, his debt for a part of the land was to be a charge upon it, for a witness who deposes against the will says such would have been his opinion, but the actual difference in the estimate value of the lands, as stated by the complainants in their bill, and by various witnesses who have deposed on the subject, proves the unsatisfactory nature of such a test of the sanity or competency of a testator, and that it is not to be relied on, even as a probable or proximate test unless the discrepancy be at once so glaring and so complete between the testator and others, as to produce the conviction either of an entire ignorance of value on his part, or of some gross delusion with respect to the particular subject. And we here remark, that the instruction given by the court, to the effect that to constitute competency in a testator he must be able to estimate with resonable accuracy the value of the various species of his property, can only be deemed correct under such a construction of the expression *reasonable accuracy* as shall make the pro-

position consistent with that which has been just now stated. If it be said that the opinion of Joel Quisenberry, as implied in the language of the will, and as positively expressed by him at the time, that he was thereby making his daughters equal to his sons, evinces such error in his estimate of value as must convict him either of gross ignorance or delusion, and therefore of incapacity, it is, upon the question of granting a new trial, a sufficient answer to say, that according to evidence which under the instruction first above noticed the jury may perhaps have disregarded, but upon which they have not directly passed their judgment, he entertained substantially the same opinion as to the equality to be produced by giving his land to his sons and his other property to his daughters, at the very time when he was in the successful career of acquisition, when his mind was entirely unaffected by disease, and when it would be a mockery to say that either from want of judgment as to value, or on any other ground, he was incompetent to dispose of the property which his own industry, skill, and good management had acquired and was acquiring.

5. The fact already noticed, that the will as first written, under the immediate dictation of the testator, without the slightest interference so far as appears, by any one else, gave the land to his sons and the other property to his daughters, affords strong confirmation to the evidence tending to show that this was in fact the rule which he had prescribed to himself for the distribution of his property, and to the inference that equality was looked to rather as a desirable incident to be attained if practicable, without a flagrant departure from the rule, than as itself constituting the rule to which the distribution must conform. It is moreover obvious to remark, that while the declaration of a father that he intends to give his lands to his sons, and his other property to his daughters, expresses a definite and precise intention which can apply to but one single mode of distribution, and which must be certainly intended by the speaker and

distinctly understood by the hearer; when he says he will make an equal will, or an equal distribution, he refers to no such precise and rigid rule, but uses expressions which may, in his own conception, as well as that of others, be affected by particular circumstances, and be satisfied by any distribution which being under the circumstances just and equitable, may be regarded as being under the circumstances substantially equal. It would be a strong illustration of this to suppose that one of two sons having paid one half of the price of a tract of land purchased by and conveyed to the father, the latter declaring that he intended to dispose of his property equally between his two sons, or that he would make an equal will, should yet give to the one who had made this payment three-fourths of the tract, and to the other one-fourth only. The circumstances would show that this was just and equitable, and might be deemed equality, and they would certainly relieve it from the imputation of being an act of madness or insanity because it departed in letter from the promised equality. And so, if it be true, as upon this record there is no reason to doubt, that Joel Quisenberry was enabled by the labor of his sons to make early and cheap additions to his landed estate, and thus to lay broadly the foundations of a fortune of which his entire family have had the advantage, it could scarcely be deemed an evidence of madness or insanity that he should think it just and equitable to give to his sons some corresponding advantage in the distribution of his estate, or that he should suppose that he might do this without any substantial violation of the principle of equality; and although these opinions might not meet with general concurrence, or might be regaded as evidence of some peculiarity of mental organization, we should hardly consider a jury as being authorised, on this ground, to declare Joel Quisenberry incompetent to make a valid will.

6. Of several particular facts, some of which appear in the will, and others occurred during its prepara-

tion, and which are relied on as proving the testator's competency, the following may be noticed in addition to the general fact already stated, that the will corresponds substantially with one set of declarations repeatedly made by the testator, as to the intended distribution of his property. He remembered the children of his deceased daughter, and that their father had promised that they should have what had been advanced to their mother, and in reliance upon this promise he had a clause in his will giving them what had been given to their mother, though advised by the draftsman that such a clause would be inoperative. The omission to name these children in the general bequest to the testator's children or daughters, until the necessity of doing so was suggested, is rather an impeachment of the memory or attention of the draftsman, who knew that they could take nothing under the general bequest, than of the testator who may have supposed that they would take in place of their mother. The testator recollected that his youngest daughter had not been advanced, and that another daughter had not been equally advanced with her sisters, and he made provision for both. When the will was written the testator had the family called in, and had the will read in presence of all. Upon the objection made by his son-in-law he appears to have been but little if at all embarrassed, and to have pursued his own purpose. He had twice, during the writing of the will, risen from his bed and gone into an adjoining room for the purpose of voiding his urine, in which it may be assumed that he was at least partially successful, and had thus obtained partial relief, as might appear from the fact that the front of his pantaloons was wet. And when the whole was finished, he arose from his bed and signed it at a table near by, and selected the two subscribing witnesses, who, upon his acknowledgment, attested the will. Upon these circumstances we need only say that they tend to prove both physical and mental ability to perform the act which was done, and

thus to corroborate the concurring opinions of those who witnessed the transaction, and of whom not one, whether friendly or opposed to the will, intimated that Joel Quisenberry was then suffering such pain as that he ought not to be troubled about a will, or was incapable of making one, or should be left in peace.

7. But in addition to the argument founded on the alleged discrepancy between the will as written, and the declared intention of Joel Quisenberry with respect to the equal disposition of his estate, which, as we conceive, constitutes the main ground of questioning his competency, and of impeaching the validity of the will, and as to which our views have been sufficiently presented, it is further contended that the jury might and should have inferred incompetency— 1st. From the great pain accompanying the particular disease, and with which the testator is shown to have been occasionally afflicted. 2d. From the fact stated by physicians, that in this disease, the suppression of urine is apt to be followed by a diffusion of the urea, producing stupor and incompentency; and 3d. From the opinions of several witnesses who saw the patient in the course of his illness of three or four weeks, and considered him incompetent to make a will or transact business at the times spoken of by them. But they were not present when the will was written or executed, and speak of different occasions.

With regard to the first of these grounds of inference, there is nothing in the evidence which required of it or authorized the jury to conclude, in opposition to the concurrent opinions of all present when the will was written and executed, either that the testator was then suffering, or that he had previously suffered such pain as, at that time, seriously to impair his intellect, and especially, if instead of then entering upon some new train of thought, from which his mind might have been diverted by pain, he was but expressing a free pre-determined will or judgment.

Upon the second ground of inference, in addition to what has just been said, it is to be remarked, that the physicans referred to, and who had not seen this patient, do not speak of this diffusion of the urea as an invariable or necessary attendance upon this disease, and the suppression of urine experienced in it, and that they expressly say that an intelligent attending physician will know better than others whether it has occurred in the particular case. The attending physicians in this case expressly negative the diffusion of the urea, or any consequent stupor or obscuration of intellect; and all concur in the statement, that in whatever mode the bladder may be relieved of its excessive contents, whether by the instrument, or by ordinary discharge, or by mere dripping, when ease from pain is restored, the intellect may operate freely and fairly. There is then, under this head, no necessary ground for inferring incapacity at the making of the will.

And even if it be assumed that the opinions referred to as forming the third ground of inference against the capacity of the testator were correct at the times to which they relate, there is no evidence to show that the same causes or facts existed when the will was executed, and there is therefore no rational certainty, no conclusive ground, for inferring, in opposition to the opinions of all who were then present, that the testator was then incompetent merely because he was at particular moments, at some indefinite period before or afterwards.

And even if, upon these inferences, the jury might have found that Joel Quisenberry, at the time of executing this instrument, was not capable of making a valid will, as to which we need not state our opinion, still, as under the instruction given, the verdict is to be regarded not as founded upon these inferences, nor as establishing them, but as founded wholly or mainly upon the fact that Joel Quisenberry had, on various occasions, represented that he would make an equal distribution of his estate, which the instru-

ment in question fails to do, the verdict can derive no effectual aid from these inferences, unless they be in themselves conclusive, and such as would not only authorize, but require a verdict asserting the incapacity of the decedent, and the consequent invalidity of the instrument offered as his will. That such is not the character of these inferences, or of the evidence from which they are claimed to be deduced, we deem absolutely certain. They are consequently insufficient to sustain the verdict, which, as being infected by the error in the instruction above noticed, and as being moreover against the weight of the evidence on the subject of competency, and certainly not conclusively sustained by the testimony, if not directly contrary to or without evidence, ought to have been set aside by the circuit court, and will be set aside by this court.

Wherefore, the decree is reversed, and the cause remanded for a new trial on principles consistent with this opinion.

ALLAN, ROBERTSON and JOHNSON for plaintiffs; HUSTON, ROBERTSON and CAPERTON for defendants.